1

2

3

4

5

6

7

8

9                  IN THE UNITED STATES DISTRICT COURT

10               FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12     ERNEST PAUL CASSIDY III, F-23445,  )
                                          )
13              Petitioner,               )        No. C 13-1988 CRB (PR)
                                          )
14         vs.                            )        ORDER  DENYING
                                          )        PETITION FOR A WRIT OF
15     GREG LEWIS, Warden,                )        HABEAS CORPUS
                                          )
16              Respondent.               )
       _____   )

17

18         Petitioner, a state prisoner at Pelican Bay State Prison in Crescent City, California,

19   seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction and

20   sentence from Sonoma County Superior Court.   For the reasons set forth below, a writ of

21   habeas corpus will be denied.

22                            **STATEMENT OF THE CASE**

23         Petitioner was convicted by a jury of first degree murder, home-invasion robbery

24   in concert with others, first degree residential burglary, and being a felon in possession of

25   a firearm.  On October 6, 2010, Petitioner was sentenced to an aggregate calculation of

26   five years plus twenty-five years to life in state prison.

27         Petitioner unsuccessfully appealed his conviction to the California Court of Appeal

28   and the Supreme Court of California, which on August 29, 2012 denied review.  He also

filed a petition for a writ of habeas corpus in Sonoma County Superior Court, which the court denied on December 3, 2012.  Petitioner appealed to the California Court of Appeal and the Supreme Court of California, and those courts denied Petitioner's habeas appeals on January 4, 2013 and March 27, 2013, respectively.

On May 1, 2013, petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court.  Per order filed on July 1, 2013, the Court found that the petition stated cognizable claims under § 2254, when liberally construed, and ordered respondent to show cause why a writ of habeas corpus should not be granted.  After receiving several extensions of time, respondent filed an answer on December 20, 2013 and petitioner filed a traverse on February 7, 2014.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

### I. INTRODUCTION

Ernest Paul Cassidy III was tried by jury and found guilty of all four counts of a second amended information charging: (1) first degree murder (Pen.Code, § 187, subd. (a)), (2) home-invasion robbery in concert with others (id., § 211, 213, subd. (a)(1)(A)), (3) first degree residential burglary (id., § 459), and (4) being a felon in possession of a firearm (id., § 12021, subd. (a)(1)). The victim in counts 1 through 3 was Jody Reynolds, and for special allegations on those counts, the jury found true firearm use by a principal (id., § 12022, subd. (a)(1)) but not personal use of a firearm or personal infliction of great bodily injury. The court found true an alleged prison-term prior. (Id., § 667.5, subd. (b).)

[Defendant Ernest Paul Cassidy III was s]entenced to an undisputed aggregate calculation of five years plus 25 years to life . . . .

### II. BACKGROUND

**A. _Summary Overview_**

In broad overview, this case involved a killing during the taking of money and drugs from Reynolds, a 43–year–old known dealer of marijuana and methamphetamine (hereafter meth) who lived and conducted his business at a trailer on his parents' property just outside Santa Rosa. All five of the perpetrators were themselves meth users and/or dealers, and the deed was done after dark on the evening of January 20, 2009. Using information from Eric Duran as to Reynolds's location and trailer layout, defendant and Nathan McGill, William Hammack, and Felix Alvarado drove to the trailer armed with at least three firearms. They robbed

2

Reynolds, inflicted blunt force trauma to his face, and killed him with two shots. One, from a handgun, was not immediately fatal but serious, entering his left buttocks and exiting at the right thigh. The second bullet, from a rifle, did massive internal damage to the organs of his lower torso, severed his spine, and was the cause of death. The four made off with meth, two safes, and cash. They divided the meth five ways (with Duran), right afterward at Hammack's residence.

Defendant was implicated in various ways, including an unfired rifle cartridge found outside the trailer that bore his palm print, but key evidence came from Duran, and from defendant's girlfriend, Brandy Wood. Duran was initially charged in all four counts, like the other four perpetrators. But in a cooperation agreement with the prosecutor, he testified in return for his pleas of guilty to home invasion robbery and being a felon in possession, with an anticipated prison term of no more than six years. Wood testified after getting financial help from the California Witness Relocation and Assistance Program, for herself and a young child (not defendant's), plus dismissal of unrelated misdemeanor charges.

The current trial was a joint one for defendant and Hammack, but with separate juries due to <u>Aranda</u> / <u>Bruton</u> concern that one nontestifying codefendant's extrajudicial statements might incriminate the other (<u>People v. Aranda</u> (1965) 63 Cal.2d 518; <u>Bruton v. United States</u> (1968) 391 U.S. 123; see generally <u>People v. Anderson</u> (1987) 43 Cal.3d 1104, 1118–1122). Hammack and defendant were each convicted on all four counts. The record also shows, and a recent opinion from our division confirms (<u>People v. McGill</u> (A129485, Jan. 19, 2012) [nonpub. opn.] ), that McGill was separately tried and convicted on all counts. It appears that, by the time of this appeal by defendant, only Alvarado remained to be tried.

The issue on appeal is whether the court abused its discretion in excluding, in a motion considered near the end of the People's case-in-chief, evidence that Dennis Silva may have been responsible for the homicide. Exactly how Silva's presence at the crime scene would be exculpatory for defendant was unclear from the motion papers, but when the court pressed defense counsel to explain, the theory that emerged was that Silva could have shown up at the trailer after the four robbers left, found Reynolds shot once with a handgun but still alive, and finished him off with a rifle, also taking a ring and a knife in the process. Defendant endorses that theory on appeal but asks variously, and ambiguously, for reversal of his "conviction" or his "convictions." It appears that, since takings of the ring and knife were not contemplated within the burglary or robbery charges against defendant, the proffered evidence had potential exculpatory value only as to the murder charge.

## B. *Victim's Home and Habits*

Reynolds's girlfriend Deanna Braddi, ex-girlfriend Heidi Schlecht, long-time friend Morris Mason, and recent friend Dave Ortega, testified that Reynolds sold large amounts of meth from his trailer, had many buyers in and out each day, used his bedroom to transact the sales, and kept money and drugs in one of two safes in the bedroom. The second safe, recently obtained from Mason, was not used because its door did not open. Schlecht

was also the mother of Reynolds's two children, ages three and seven. Since her breakup with him 18 months earlier, she was at the trailer almost daily, usually with the children, who had their own bedroom there. Schlecht testified under a grant of immunity.

The trailer was a 45–foot–long double-wide mobile home situated on an acre of property owned by Reynolds's father, and the father and stepmother lived in a house that was over 100 yards away, where they could not hear sounds from the trailer. They knew that physical problems had ended Reynolds's work as a tile setter, but had no idea that he sold drugs. Reynolds played and collected guitars, and kept about 35 of them in the trailer, displayed on walls. The location was far from neighbors. A long dirt-road driveway that started at a gate over 100 feet from the trailer led to Mountain View Avenue at an intersection about a quarter mile east of Santa Rosa Avenue. The area around the trailer was lit by just a porch light, with no street lights. Reynolds had surveillance equipment outside, but it was not hooked up.

### C. *The Hours Preceding the Killing*

Accounts by friends and family who interacted with Reynolds the day he died showed that he must have been killed after 8:19 p.m. Braddi and Schlecht had been at the trailer that morning, each leaving by afternoon. Schlecht returned, with the children, around 4:00 p.m. She smoked meth with Reynolds for the second time that day, left to sell meth to a friend nearby, played soccer with Reynolds and the children for awhile, and then left for home with them by about 5:30 p.m. Reynolds was getting ready to leave, to have dinner with or pick up a guitar from Kenny Gilbert. Reynolds said he would call her when he got back, in case she wanted to come back over. Reynolds also told Braddi, in a call she made to him around 6:00 p.m., that he was going to Forestville to pick up a guitar from Gilbert. Gilbert testified that he and Reynolds liked to play guitars together and that Reynolds was to come over to his place around 5:30 or 6:00 p.m. for dinner and to pick up a guitar Gilbert had had refinished for him. Gilbert called him about half an hour before the arranged time. Reynolds said he was getting dressed but on his way and that he was running late because he was waiting for Schlecht and "Morey" to leave. Reynolds never showed up.

Longtime friend Morris Mason testified that he went over to the trailer that evening around 6:00 p.m. to borrow a shotgun for goose hunting. Only Reynolds was in the trailer, and he was in the shower and planning to go out. While he waited, Mason tried in Reynolds's bedroom to open the safe he had brought him earlier. Reynolds left for his parents house to retrieve a shotgun, while Mason kept working on the safe, but the shotgun Reynolds brought back was not a type suitable for shooting geese. Mason did not borrow it and never got the safe open, but he stayed with Reynolds for quite awhile. While there he saw a large freezer bag containing meth and, on the bed in Reynolds's bedroom, a wad of cash. He left between 7:00 and 7:30 p.m., when it was dark.

The last friendly communications Reynolds had that night were evidently from his parents and Braddi. His stepmother heard him in the house talking with his father before 8:00 p.m., and although she could not

4

see him from the family room, she called out "hi" to him. Braddi texted Reynolds shortly before 8:00 p.m., asking if he would pick her up on the way back from Forestville. He texted her back at 8:19 p.m.: " 'Of course, Babe. I love you.'"

### D. *Discovery of the Killing*

David Ortega had been doing work for Reynolds's parents, using a tractor to grade the dirt road. He was also a friend of Reynolds, had known him about a year and, since his release on parole eight months earlier, had dropped by the trailer regularly, sometimes several times a day. He would hang out, play guitars, and smoke meth that Reynolds usually provided for free. Ortega stayed out of the drug dealing but knew that Reynolds did it [in] the bedroom. He also knew about the safes (having helped move them into the room), and knew Rags, a Jack Russell Terrier at the trailer that always ran up to greet him when he arrived.

On the evening of the killing, Ortega drove up to the property sometime before 9:00 p.m. with two purposes. One was to trade Reynolds a stolen drill for some meth, and the other was to meet with someone he only knew as Dennis (later identified as Dennis Silva) about earning a couple hundred bucks to "kick someone's ass" for Dennis because someone was "giving him problems." Dennis was Reynolds's friend, but while Ortega had seen and greeted him at the trailer before, he had never really talked with him. Ortega had been called about the meeting at 8:03 p.m., either by Reynolds or Dennis. Ortega was 20 minutes late for the meeting because he was installing a clutch.

Upon parking and then nearing the trailer with the drill, Ortega saw signs that something was amiss. The gate was open; a vintage guitar was outside leaning against Reynolds's car; a sliding glass door to the trailer was wide open; there was no sound; and while the porch light was on and the trailer lit up inside, no one came out, not even Rags. Inside, clothes and things were tossed around. Ortega called out for Rags and eventually heard him whimpering in the back bedroom. He saw Reynolds lying lifeless on his side and Rags huddled between the body and one wall of the room. Both safes were gone, and it looked like a couple of drawers had been emptied. Reynolds had a bloody cut on his forehead, but no other visible injuries.

Ortega went to the parents' house, eventually roused them by knocking on their door, told them what he found, and urged that they call 911 (Ortega lacking a cell phone). The parents being elderly, it took some 20 minutes from the discovery to get them to the trailer. There, the stepmother called 911 on her cordless phone, and Ortega spoke with the 911 operator. Back inside, the three turned Reynolds over and saw blood from his shooting injuries. A paramedic responding to a 9:39 p.m. call arrived four minutes later but was unable to resuscitate Reynolds. The paramedic contacted the Sonoma County Sheriff's Department, and Ortega stayed around to speak with fire department personnel and Deputies Charles Blount and Christopher Vivian. Dennis never showed up.

Surveillance video from cameras at Tower Mart suggested that the killing might have been between 8:40 and 8:50 p.m. The business was

located on the corner of Santa Rosa Avenue and Todd Road, nine-tenths of a mile and a 90–second drive from the crime scene. Time-marked video showed, at 8:37 p.m., a gray Dodge Intrepid like Hammack's come east down Todd Road, from the Highway 101 freeway, and turn right (south) onto Santa Rosa Avenue, toward the crime scene. Then at 8:45 p.m., the same or a similar vehicle went the opposite way, back toward the freeway. Then at 9:02 p.m., a truck consistent with Duran's passed by. Actual times were five minutes later than what the time markings indicated.

### E. *Accounts by Duran and Wood*

**Duran.** In January 2009, Duran was a contractor but supported himself by selling meth. He injected the drug daily, lived out of motels, and drove a charcoal gray Dodge truck. He had befriended Heidi Schlecht eight or nine months earlier. They did not have a "dating relationship" but, as Schlecht would corroborate, had been "intimate" several times. Duran came to know that her ex-boyfriend, Reynolds, sold meth, and actually met him just two or three months before he died. The first meeting was brief, when Reynolds came by Schlecht's house in Santa Rosa. The second was at Reynolds's trailer, at Reynolds's invitation. This situation seemed odd enough to Duran that he came armed with a .380 caliber semiautomatic gun, but it turned out that Reynolds wanted him to set up Heidi's boyfriend so that Reynolds could "beat him up, because he had problems with him." The boyfriend would always run off when he saw Reynolds, and since Duran knew the guy, Reynolds wanted him to lure him for a set up. Duran declined, and Reynolds said, "I respect that." There was no discussion of meth to that point.

A week later, at another meeting at the trailer, they did talk about meth. Duran asked if he could do business with Reynolds if his usual source fell through. Reynolds said, "That's fine, Eric. No problem." No sale occurred, but Duran saw that Reynolds had rolls of money in an open safe in his bedroom, and three Ziploc-like bags holding softball-size amounts worth about $7,500 each. Then on six occasions over the next month and a half or so, when his usual source had none, Duran got meth at the trailer, always in one-ounce quantities and for $1,300, which was expensive but worth it because Reynolds had good drugs. Reynolds fronted him the meth each time, and Duran would pay him the next day. The arrangement worked until the last sale, four or five days before Reynolds died. Duran was a couple hundred dollars short the next day, and Reynolds told him not to come by until he had all of it. Duran never saw him again.

Around the time of that last transaction, Duran first met defendant through a mutual friend and, since Duran knew defendant's family and grew up with his uncle, agreed to sell him meth in smaller quantities than usual. The first such sale triggered an almost nonstop barrage of e-mails and texts from defendant and his almost constant companion, Hammack, asking things like what he was doing and where he was. The duo also surprised him by popping up everywhere he went. This onslaught, reaching 30 messages a day at times, gave Duran "a really weird vibe." Given the risks of assault and robbery in the drug business and his having been beaten up several months earlier, he wanted to end the relationship. Still, he sold to defendant six or eight times in all and never cut off the sales.

6

1

2          Defendant started asking Duran where his connection lived, and
3   Duran came to understand that this meant defendant wanted to rob his
    connection. On the day of the killing, Duran relented and showed him
    where Reynolds lived, thinking that it might rid him of defendant. At 4:30
4   or 5:00 p.m., Duran met defendant at a Rotten Robbie gas station on Todd
    Road, near the freeway. Duran left his truck and, it still being light out, got
5   into the backseat of defendant's car, where tinted windows kept him from
    being seen. He directed defendant to the trailer and pointed it out to him.
6   They drove as far as the gate at the end of the driveway and, without
    stopping, turned around and drove directly back, taking just four or five
7   minutes in all. In the process, Duran told defendant about the safe, the
    location of the bedroom, and the large amounts of cash and meth he had seen.

8          Around the same time, Duran got a call from Schlecht. She told him
9   she was at Reynolds's place and wanted to get high with Duran. Duran had
    not seen her BMW at the trailer. He drove his truck to her house after
10  making a couple stops in Santa Rosa, getting no calls from defendant or
    Hammack during that time. He arrived at Schlecht's house sometime
11  between 7:00 and 7:30 p.m., finding her already there. He stayed 45 to 50
    minutes, during which they "slammed" (injected) meth and had sex. A call
12  on his cell phone from defendant spurred him to take a quick shower and
    leave, trying repeatedly to call defendant back. Schlecht's testimony was
13  similar: She had called him from Reynolds's trailer and again when she was
    nearly home with the children. She and Duran used meth and had sex; and
14  Duran rushed out of the bedroom, panicky, after getting a brief call during
    which he said things like " 'no,' or 'wait,' or something." He may have
15  taken a shower, too.

16         Defendant had said he was going to "hit" Duran's "connect," and
    hung up. Duran understood this to mean defendant would hit his
17  connection—i.e., rob Reynolds. He tried over and over to call defendant
    back and tell him not to do it, but never got through. Being familiar with
18  Hammack's apartment at the Pinecrest Apartments on Piner Road and
    feeling that defendant would eventually go there, Duran drove directly there
19  and waited in a parking lot across the street, still trying to phone defendant.
    (Contrary to what the Dodge truck image on the Tower Mart video might
20  have suggested, Duran testified that his route from Schlecht's house in
    Bennett Valley to the Pinecrest Apartments did not take him past the Tower
21  Mart and that he never drove by there after about 5:00 p.m. that day.)

22         After 20 minutes, Hammack's car pulled up outside the apartment
    and several people jumped out and ran in, one carrying at chest height
23  something large and perhaps wrapped in a blanket. Duran followed (leaving
    his gun in the truck) and entered through a partly open door. Inside, rushing
24  around, were defendant, Hammack, and two men he did not know but
    would learn were Alvarado and McGill (called "Uncle" by the others).
25  There were four or five guns, including a sawed-off shotgun, a rifle with a
    clip in it, and a handgun, and McGill was wiping the guns down.

26         Defendant stood in the main room wide-eyed, sweating, shaking, and
27  surprised to see Duran. He said, " 'Eric, I fucking blasted him,' " and told

28                                        7

what happened. He said Reynolds kept coming in and out of the room, smoking a pipe, saying "there's no money here," that the meth was "picked up this morning," and, "Get out of my house." After defendant blasted him, Reynolds was shot again, " 'in the ass.' " (Duran testified that, although he had told Detective Vivian that defendant used a shotgun, he did not know what kind of gun defendant used, and did not recall seeing a shotgun in Hammack's apartment.) Defendant had Duran give him the keys to his truck, and then left the apartment for five minutes before returning with them.

Hammack seemed calm, but McGill, who had been on the phone, motioned Duran into a bedroom by pointing with a handgun. Inside the room, he threatened Duran that if he told anyone, he was dead.

Duran saw no cash in the apartment but saw meth, and after McGill threatened him, everyone went into the kitchen to divide it up. Using a digital scale, Duran divided it five ways, taking a share for himself. Each share was worth about $800. McGill had left the apartment for 30 minutes or so after threatening Duran, but was back by the time the drug was divided.

Duran met with defendant and Hammack the next morning at a gas station and, two days later, at Hammack's apartment to help them open a safe. He had brought them a cutoff saw, which had not started, so now they drove—Hammack in the truck and defendant following in his own car—to rural Sonoma County, where a friend of Duran's lived. Defendant removed the safe from his trunk, and Duran set to work on the safe's heavy hinges with a hammer and bolt. He got the hinge pins loose with little effort but, in starting to open the safe door, looked up to catch defendant trying to shove rifle-looking guns up under the seat of his truck. One gun had a clip, and another was "cut off." Duran objected, " 'What are you doing?' " and stopped defendant. Then, nervous when a strange couple pulled up behind them in an SUV, the trio finished the job at a cousin's property in Cazadero or Guerneville. The safe was empty. Duran and Hammack disposed of it by driving up into the mountains and throwing it off the truck.

**Wood.** Brandy Wood and her son lived in a house in Bennett Valley. She used meth daily, had known defendant for years, had dated him for six months, and knew Hammack to be a friend of his. Defendant came to her house one day that January with a "big and black" part of a gun, gave it to her, and told her to get rid of it. He also handed her a newspaper article about a man having been killed. She read the article and asked if he had something to do with it, saying, "Is this you?" Defendant said, "Yes." He told her that he was there, that the man was "shot execution style," that he died, and that meth and a safe were taken. He also said Eric set it up for him. Wood knew Duran only from once buying meth from him. Defendant did not say who shot the man or whether anyone else was involved.

Unsure what to do with the gun part, Wood first put it under her bed, and then tried to break it apart with a hammer. When that did not work, she "wiped the fingerprints off of it," wrapped it in newspaper, duck-taped over that, put it in a bag, and taped it again. That night, she put the package under the porch of her house. The packaging was meant to make it difficult to get to the part and keep anyone from knowing it was under the porch.

A couple of days later, defendant texted Wood about wanting the part back, but on January 27, seven days after the shooting, when Wood was visited at home by Deputy Vivian, she wound up showing Vivian where it was. Deputies retrieved it, and information that Wood gave Vivian in a two hour interview later that day "broke th[e] case wide open" for the investigation. The gun part proved to be a magazine clip for an SKS rifle. Until then, the investigation had not focused on such a weapon or any connection to Duran, who was arrested and interviewed the next day. This was also the first time the names of defendant, Hammack, McGill, and Alvarado had come up in the investigation.

**F. *Further Investigation***

Duran was fearful but soon began telling deputies what he knew and led them to where the safe was dumped. It was recovered from a creek, its door missing. Soon afterward, the second safe was brought to the sheriff's office by a friend of Duran's.

An autopsy showed that the immediate cause of Reynolds's death was a full metal jacket bullet from a rifle. It lay lodged in the soft tissues of his left back, about even with the height of the entry wound in his right abdomen. It was extraordinarily unlikely that Reynolds could survive the wound, even if he had immediate and optimal care in an emergency room. The other wound was from a lead-nose .45 caliber pistol-type bullet, from a different weapon. It entered his left buttock and passed through his pelvic region and lower scrotum. Since the bullet hit no critical structures and did not enter internal body cavities or bone, it would not have been immediately lethal by itself, but Reynolds would have bled to death if not treated. The autopsy did not reveal which shot was fired first.

In a warrant search of a house in Santa Rosa where Alvarado and McGill lived, sheriff's deputies found a .45 caliber Ruger revolver, a sawed-off 20–gauge shotgun, boxes of ammunition for each weapon, and a high-capacity SKS-style magazine. In a shed-like living unit behind the house was a newspaper article about the killing, and a Halloween-type mask. A cell phone Alvarado carried upon his arrest retained two photos of an SKS rifle taken six days before the killing (both since deleted). Ballistics tests showed that the revolver bullet recovered during the autopsy was fired either from the Ruger or one of only a couple dozen Ruger barrels manufactured with the identical tooling.

The black steel clip defendant had given to Wood to get rid of was an after-market clip that fit an SKS rifle. The unfired round with defendant's palm print found outside Reynolds's trailer was a 7.62 by 39 millimeter full-metal-jacket cartridge compatible with an SKS rifle, and so were a box of cartridges found in Hammack's vehicle. Hammack and defendant were found seated together in the back seat of the vehicle as it was parked outside Hammack's apartment.

**G. *The Defense***

Defendant did not testify. Since many of the witnesses against him admitted to regular meth use, the defense presented testimony by an expert

1   on the effects of meth addiction and use on human behavior, stressing
    impaired ability to accurately perceive and recall events.

2

3       Defense counsel Joe Stogner used that testimony in summation as
    part of a broad attack on Duran's and Wood's credibility. He stressed their
    relationship, drug use, and self interests (Duran in securing a plea

4   agreement and Wood in securing relocation help), and accused investigators
    and the prosecution of jumping aboard "the Duran Express" by accepting

5   everything Duran said, uncritically and without corroboration.

6       Stogner also urged jurors to consider whether Dennis Silva had a
    hand in the killing: "How is [Duran] connected with David Ortega? I've

7   already told you about these sort of odd things that he—he was asked to set
    up, that he did try to set up, these hurts he's tried to put on people. And

8   now, on the night of this homicide, David Ortega gets a phone call from
    Dennis to meet him at Jody Reynolds'[s] house because they are going to go

9   beat somebody up. He's supposed to be there at 9:00. David Ortega is late.
    He pulls up, 9:20 to 9:30. No Dennis, but a decedent l[y]ing on the floor.

10  No Dennis, but a dead man.

11      "Where is Dennis? Who is Dennis? And did he drop by like he said
    he was going to, right at the time or right around the time that Jody

12  Reynolds was killed? Why don't we know that? We may not know that
    because we decided that the Duran Express was going to run this thing, that

13  everybody was going to get on that.

14      "But you, as the jury in this case, you have to ask yourself, what
    happened to Dennis, and did he go over there or not? It's an interesting

15  question because Ortega knows Dennis."

16      Implicitly raising again the specter of Silva's involvement, Stogner
    also suggested that the truck captured on video going by the Tower Mart at

17  9:02 p.m. was not Duran's, and faulted investigators for assuming that it
    was or, alternatively, not considering that its appearance there did not jibe

18  with Duran's account.

19  People v. Cassidy, No. A131029, 2012 WL 2126958, at **1-8 (Cal. Ct. App. June 13,

20  2012) (footnotes omitted).

21                      **STANDARD OF REVIEW**

22      This court may entertain a petition for a writ of habeas corpus "in behalf of a

23  person in custody pursuant to the judgment of a State court only on the ground that he is

24  in custody in violation of the Constitution or laws or treaties of the United States."  28

25  U.S.C. § 2254(a).

26          /

27

28                              10

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application " inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority " for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably " applied. Id.

11

## CLAIMS & ANALYSIS

Petitioner raises several claims for relief under § 2254, including various instances of ineffective assistance of counsel at both the trial and appellate levels, and improper exclusion of evidence.  For discussion purposes, the claims will be classified into two general categories: (A) ineffective assistance of counsel; and (B) denial of due process.

A.      Ineffective Assistance of Counsel

Petitioner raises five claims of ineffective assistance of <u>trial</u> counsel.  He claims that trial counsel was ineffective for: (1) not testing fingernail clippings taken from the hands of the victim Jody Reynolds; (2) not testing fibers taken from the victim's back; (3) not testing blood found on a pair of Eric Duran's pants; (4) not investigating leads that someone named Steven Reiner had informed the authorities that another man asked him to conduct a professional hit on the victim; and (5) failing to conduct a preliminary investigation, failing to interview prosecution witnesses, and failing to compel examination of DNA evidence.  Additionally, Petitioner raises a single claim of ineffective assistance of <u>appellate</u> counsel, arguing that appellate counsel was ineffective for choosing to make a third-party culpability argument that essentially admitted Petitioner was present at the crime scene on the night of the charged crimes.

1.      Ineffective Assistance of Trial Counsel

To prevail on a claim of ineffective assistance of trial counsel, petitioner must pass the two-part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). Petitioner must demonstrate that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "counsel's deficient performance prejudiced the defense."  <u>Id.</u> at 687-88.  Concerning the first element, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Id.</u> at 689.  Hence, "judicial scrutiny of counsel's performance must be highly deferential."  <u>Id.</u>  To fulfill the second element, a "defendant must show that there is a reasonable

1  probability that, but for counsel's unprofessional errors, the result of the proceeding

2  would have been different." Id. at 694.  A reasonable probability is a probability

3  sufficient to undermine the confidence in the outcome.  Id.

4        Petitioner must first show that trial counsel's performance was deficient.  This

5  requires showing that counsel made errors so serious that counsel was not functioning as

6  the "counsel " guaranteed by the Sixth Amendment.  See id. at 687.  Petitioner must show

7  that counsel's representation fell below an objective standard of reasonableness.  See id.

8  at 688.  Judicial scrutiny of counsel's performance must be highly deferential, and a court

9  must indulge a strong presumption that counsel's conduct falls within the wide range of

10  reasonable professional assistance.  See id. at 689.  Courts generally presume that

11  "counsel's attention to certain issues to the exclusion of others reflects trial tactics rather

12  than sheer neglect."  Harrington v. Richter, 131 S. Ct. 770, 790 (2011) (internal citations

13  and quotation marks omitted); see also id. at 791 ("[A]n attorney may not be faulted for a

14  reasonable miscalculation or lack of foresight or for failing to prepare for what appear to

15  be remote possibilities.").  It is unnecessary for a federal court considering a habeas

16  ineffective assistance of counsel claim to address the second (prejudice) prong of the

17  Strickland test if the petitioner cannot even establish incompetence under the first prong.

18  See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

19        The second prong of Strickland requires the petitioner to show that counsel's

20  errors were so serious as to deprive him or her of a fair trial.  Strickland, 466 U.S. at 688.

21  The petitioner must show that there is a reasonable probability that, but for counsel's

22  unprofessional errors, the result of the proceeding would have been different.  Id. at 694.

23  Where the petitioner is challenging his conviction, the appropriate question is "whether

24  there is a reasonable probability that, absent the errors, the factfinder would have had a

25  reasonable doubt respecting guilt."  Luna v. Cambra, 306 F.3d 954, 961 (9th Cir. 2002)

26  (quoting Strickland, 466 U.S. at 695).  A court need not determine whether counsel's

27

28                                              13

1   performance was deficient before examining the prejudice suffered by the defendant as a

2   result of the alleged deficiencies.  See Strickland, 466 U.S. at 697.

3        A difference of opinion as to trial tactics does not constitute denial of effective

4   assistance, see United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981), and tactical

5   decisions are not ineffective assistance simply because in retrospect better tactics are

6   known to have been available, see Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984).

7        A petitioner can only make out a claim of ineffective assistance of counsel by

8   pointing to specific errors made by trial counsel.  See United States v. Cronic, 466 U.S.

9   648, 666 (1984).  The burden of proving both deficient performance and prejudice is the

10  petitioner's.  See Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir. 1990); see also Rios v.

11  Rocha, 299 F.3d 796, 813 n.23 (9th Cir. 2002) (rejecting two ineffective assistance of

12  counsel claims based on petitioner's failure to produce evidence of prejudice).

13       Petitioner points to multiple specific errors by trial counsel.  The Court will

14  consider each alleged error in turn.

15              a.    Failure to test victim's fingernail clippings

16       Petitioner claims that trial counsel was ineffective because he failed to test the

17  victim's fingernail clippings.  Petitioner claims that because the victim fought with his

18  assailants, the fingernail clippings "very well could have identified the assailant(s)."

19  Petition at 6B.  The duty to investigate, however, "is not limitless."  Douglas v.

20  Woodford, 316 F.3d 1079, 1088 (9th Cir. 2003).  "An attorney need not pursue an

21  investigation that would be fruitless, much less one that might be harmful to the defense."

22  Harrington v. Richter, 131 S. Ct. 770, 789-90 (2011) (citing Strickland, 466 U.S. at 691).

23       Petitioner offers no evidence that testing the victim's fingernail clippings would

24  have been conclusive or even helpful.  Perhaps trial counsel knew the test was impossible

25  or would have been a waste of time.  Perhaps trial counsel feared the test could confirm

26  Petitioner's guilt.  But the Court need not speculate on this issue because it is Petitioner's

27

28                                      14

1  burden to demonstrate ineffective assistance, and Petitioner has failed to demonstrate

2  either deficient performance or prejudice as a result of counsel's tactical decision.

3  Petitioner's mere speculation is not enough to demonstrate that there is a reasonable

4  probability that, had trial counsel tested the fingernail clippings, the outcome of the trial

5  would have been different.  See Strickland, 466 U.S. at 694.

6      Petitioner is not entitled to federal habeas relief on his claim that trial counsel was

7  constitutionally ineffective for failing to test the victim's fingernail clippings.  The state

8  courts' rejection of the claim was not an objectively unreasonable application of

9  Strickland.  See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 409.

10              b.      Failure to test fibers collected from victim's back

11      Petitioner claims that trial counsel was ineffective because he did not test fibers

12  collected from the victim's back.  Petitioner argues that these fibers are "equally [as]

13  important [as the victim's fingernail clippings] if one believes that the victim had contact

14  with his attacker."  Petition at 6B.  But, much like Petitioner's previous claim related to

15  the victim's fingernail clippings, Petitioner offers nothing concrete to demonstrate that

16  the fibers collected from the victim's clothing would have been conclusive, or even

17  helpful, in any way.  Any test of the fibers could just as reasonably have been

18  inconclusive, a waste of time, or corroborate Petitioner's guilt.  Again, Petitioner's mere

19  speculation is not enough to demonstrate that there is a reasonable probability that, had

20  counsel tested the fibers, the outcome of the trial would have been different.  See

21  Strickland, 466 U.S. at 694.

22      Petitioner is not entitled to federal habeas relief on his claim that trial counsel was

23  constitutionally ineffective for failing to test fibers collected from the victim's back.  The

24  state courts' rejection of the claim was not an objectively unreasonable application of

25  Strickland.  See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 409.

26      /

27

28                                  15

1              c.     Failure to test blood on Eric Duran's pants

2       Petitioner claims that trial counsel was ineffective because he did not test blood

3   found on pants recovered from Eric Duran's truck.  Petitioner argues that because Eric

4   Duran was initially arrested in connection with the burglary and murder, then became a

5   cooperating witness and provided testimony critical to Petitioner's conviction, counsel's

6   failure to test the bloody pants was ineffective assistance of counsel.  See Petition at 6C.

7       Police found the bloody pants inside a duffel bag located in Eric Duran's truck

8   eight days after the murder.  18 RT 1555.  On the prosecution's motion to suppress

9   introduction of the pants, Petitioner's counsel argued that the pants were relevant because

10  the jury could infer that the prosecution's decision not to test the blood on the pants was

11  damaging to Duran's credibility.  See 18 RT 1587-88.  Petitioner's  counsel specifically

12  argued that the prosecution's failure to test the blood on Duran's pants suggested that the

13  prosecution had some sort of agreement with Duran in consideration for his testimony.

14  See id.  Under the circumstances, trial counsel made a reasonable tactical choice not to

15  test the blood on the pants and instead use the prosecution's decision not test it as a means

16  of attacking Duran's credibility as a witness.  See Harrington, 131 S. Ct. at 790.

17  Petitioner offers no evidence to the contrary.  Nor does he offer any evidence that there is

18  a reasonable probability that, had trial counsel tested the blood on the pants, the result of

19  the trial would have been different.  See Strickland, 466 U.S. at 694.

20      Petitioner is not entitled to federal habeas relief on his claim that trial counsel was

21  constitutionally ineffective for failing to test the bloody pants.  The state courts' rejection

22  of the claim was not an objectively unreasonable application of Strickland.  See 28 U.S.C.

23  § 2254(d); Williams, 529 U.S. at 409.

24              d.     Failure to investigate leads about Steven Reiner

25      Petitioner claims that trial counsel was ineffective for failing to investigate leads

26  that a man named Steven Reiner may have played a role in the victim's murder.

27

28                                         16

Petitioner alleges that law enforcement investigators interviewed Reiner, and Reiner told investigators that someone named Michael Campbell had asked him to conduct a professional hit on the victim.  Petition at 6D.  Petitioner argues that because Reiner's polygraph examination was "inconclusive," trial counsel's failure to further investigate Reiner and his statements amounted to ineffective assistance of counsel.  Id.

Once again, Petitioner offers no more than mere speculation in support of his claim.  He offers no evidence whatsoever that trial counsel's decision not to further investigate Reiner was unreasonable and prejudicial.  Borrowing the words of the state appellate court, none of the characters connected to the crimes were model citizens.  Most, if not all, were regular methamphetamine users.  But this does not mean that every angle related to every character had to be investigated.  That Reiner was asked by someone to kill Reynolds does not mean that Reiner acted on the request.  Petitioner's counsel cannot be said to have been ineffective for not investigating Reiner further because Petitioner offers no evidence whatsoever that Reiner was involved in Reynolds's murder in any way.  Petitioner has not met his burden of showing that there is a reasonable probability that, had trial counsel investigated Reiner further, the result of the trial would have been different.  See Strickland, 466 U.S. at 694.

Petitioner is not entitled to federal habeas relief on his claim that trial counsel was constitutionally ineffective for failing to investigate Reiner.  The state courts' rejection of the claim was not an objectively unreasonable application of Strickland.  See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 409.

> e.    Failure to defend against the charges

Petitioner finally claims that trial counsel was so ineffective that he failed to provide a defense against the charges.  Petitioner argues that trial counsel "put on no defense; conducted no preliminary investigation; interviewed none of the witnesses disclosed by the prosecution; and failed without reason to compel examination of

1  collected DNA evidence."  Petition at 6E.  According to Petitioner, trial counsel's use of

2  only one witness, an expert on the effects of methamphetamine addiction, amounted to

3  ineffective assistance of counsel.

4      Petitioner's "catch-all" claim must be rejected as conclusory and speculative.  See

5  Jones v. Gomez, 66 F.3d 199, 205 (9th Cir. 1995) (conclusory allegations of ineffective

6  assistance of counsel do not warrant federal habeas relief).  The record shows that trial

7  counsel's defense hinged primarily on allegations of third-party culpability and expert

8  testimony about the effects of methamphetamine use on memory and perception.  Because

9  most of the prosecution witnesses were regular methamphetamine users, this was a

10  reasonable tactical decision.  Petitioner does not show that this was an unreasonable

11  course of action and that there is a reasonable probability that, had counsel taken a

12  different course of action, the result of the trial would have been different.  See

13  Strickland, 466 U.S. at 694.

14      Petitioner is not entitled to federal habeas relief on his claim that trial counsel was

15  constitutionally ineffective for failing to defend against the charges.  The state courts'

16  rejection of the claim was not an objectively unreasonable application of Strickland.  See

17  28 U.S.C. § 2254(d); Williams, 529 U.S. at 409.

18      2.      Ineffective Assistance of Appellate Counsel

19      The Due Process Clause of the Fourteenth Amendment guarantees a criminal

20  defendant the effective assistance of counsel on his first appeal as of right.  Evitts v.

21  Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate

22  counsel are reviewed according to the standard set out in Strickland v. Washington, 466

23  U.S. 668 (1984).  First, the petitioner must show that appellate counsel's performance

24  was objectively unreasonable, which requires the petitioner to demonstrate that counsel

25  acted unreasonably in failing to discover and brief a merit-worthy issue.  Smith v.

26  Robbins, 528 U.S. 259, 285 (2000).  Second, the petitioner must show prejudice, which in

27

28                                     18

1   the appellate context means that the petitioner must demonstrate a reasonable probability

2   that, but for appellate counsel's failure to raise the issue, the petitioner would have

3   prevailed in his appeal.  Id. at 285-86.

4         It is important to note that appellate counsel does not have a constitutional duty to

5   raise every nonfrivolous issue requested by the petitioner.  See Jones v. Barnes, 463 U.S.

6   745, 751-54 (1983).  The weeding out of weaker issues is widely recognized as one of the

7   hallmarks of effective appellate advocacy.  See Miller v. Keeney, 882 F.2d 1428, 1434

8   (9th Cir. 1989).  Appellate counsel therefore will frequently remain above an objective

9   standard of competence and have caused his client no prejudice for the same reason –

10   because he declined to raise a weak issue.  Id.

11         Petitioner raises a single claim of ineffective assistance of appellate counsel.

12   Petitioner claims that appellate counsel's chosen narrative with respect to third-party

13   culpability amounted to an admission of guilt.  Because appellate counsel claimed that

14   another shooter could have potentially arrived on the scene and "finished the job, " for

15   lack of a better term, Petitioner argues appellate counsel necessarily admitted that

16   Petitioner was present at the scene of the crime that evening.  Petitioner maintains that he

17   was never present, and that he is completely innocent.  According to Petitioner, appellate

18   counsel's "gross[] misrepresent[ation]" of the facts amounts to ineffective assistance of

19   appellate counsel.  Petition at 6F.

20         The record shows that trial counsel for Petitioner set forth a third-party culpability

21   defense.  At trial, Petitioner's counsel argued that Dennis Silva arrived after the robbery

22   and killed Reynolds.  18 RT 1484.  Petitioner's appellate counsel reasonably chose to

23   carry the narrative forward in support of the claim on appeal that the trial court erred in

24   excluding certian third-party culpability evidence.  See Smith, 528 U.S. at 285.

25   Regardless, Petitioner has failed to carry his burden of demonstrating that there is a

26   reasonable probability that, but for appellate counsel's chosen narrative, Petitioner would

27

28                         19

have prevailed on appeal.  See id. at 285-86.  Petitioner's insistence that he is innocent does not compel a different conclusion.

Petitioner is not entitled to federal habeas relief on his claim that appellate counsel was constitutionally ineffective for adopting the above-described narrative.  The state courts' rejection of the claim was not an objectively unreasonable application of Strickland.  See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 409.

B.    Denial of Due Process

Petitioner claims that he was denied his due process right to a fair trial because the trial court excluded certain third-party culpability evidence; specifically, certain evidence that Dennis Silva may have been responsible for the murder of Reynolds.  The trial court did not exclude all evidence about Silva, however.  Ortega's testimony that he, Silva, and Reynolds were to have a meeting that night to discuss paying Silva to "kick someone's ass" was admitted, and defense counsel exploited that testimony and related evidence to suggest that Silva was involved.  Petitioner's claim of improper exclusion of certain third-party culpability evidence is without merit.

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (internal citations and quotation marks omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence).  This latitude is limited by a defendant's constitutional rights to due process and to present a defense, rights originating under the Sixth and Fourteenth Amendments.  See Holmes, 547 U.S. at 324.  But the Constitution permits trial judges, applying well established rules of evidence, "to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  Id. at 325-26.

In deciding if the exclusion of evidence violates the due process right to a fair trial

1     or the right to present a defense, courts balance the following five factors: (1) the

2     probative value of the excluded evidence on the central issue; (2) its reliability; (3)

3     whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence

4     on the issue or merely cumulative; and (5) whether it constitutes a major part of the

5     attempted defense. Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004). Courts also give

6     due weight to the state interests underlying the state evidentiary rules on which the

7     exclusion was based. See id. at 1006.

8         The exclusion of trustworthy evidence that another person may have committed

9     the crime violates due process and the Sixth Amendment. See Chambers v. Mississippi,

10    410 U.S. 284, 302-03 (1972). The Supreme Court's decision in Chambers "clearly

11    established that the exclusion of trustworthy and necessary exculpatory testimony at trial

12    violates a defendant's due process right to present a defense." Cudjo v. Ayers, 698 F.3d

13    752, 754 (9th Cir. 2012) (emphasis added).

14        Petitioner claims he was denied his due process right to a fair trial when the trial

15    court excluded six pieces of evidence concerning Silva. He argues that the proffered six

16    pieces of evidence support his theory that Silva could be the true murderer.

17        On the night of the murder, Silva was supposed to meet David Ortega at the

18    victim's trailer. When Ortega arrived at the trailer, Silva was not there and Reynolds lay

19    dead on the trailer floor. At trial, Petitioner sought to introduce six pieces of evidence

20    attempting to connect Silva with the murder. The trial court excluded the evidence to

21    avoid jury confusion after determining that the proffer was highly speculative and not

22    probative. The California Court of Appeal affirmed the judgment of the trial court. It

23    found that the risk of undue time consumption and confusion clearly outweighed the

24    weak probative value of the proffered evidence. Cassidy, 2012 WL 2126058, at *12.

25        The California Court of Appeal's rejection of Petitioner's improper exclusion of

26    evidence claim was not contrary to, or an unreasonable application of, clearly established

27

28                                 21

1    Supreme Court precedent, nor did it involve an unreasonable determination of the facts.

2    See 28 U.S.C. § 2254(d).

3          Petitioner first claims that the trial court erred in excluding evidence that Dennis

4    Silva attempted to flee from police on the morning after the robbery/homicide.  3 CT 534.

5    Police had to shoot out Silva's tires to make him stop his car.  Id.  As the state appellate

6    court noted, this behavior is suspicious until one considers the surrounding circumstances.

7    The police attempted to stop Silva at 5:15 a.m., nowhere near the scene of the murder and

8    about eight hours afterwards.  Cassidy, 2012 WL 2126958, at *11.  Silva was on parole,

9    and likely a drug user.  Id.  His decision to flee from the police under these circumstances

10   is not as probative of guilt of Reynold's murder as Petitioner suggests, especially when

11   weighed against the likelihood of jury confusion and undue delay.

12         Second, Petitioner claims that the trial court erred in excluding evidence that Silva

13   initially lied to police investigators after his arrest about recent contacts with the victim.

14   But Silva eventually came clean and told the truth about his contacts with the victim.

15   Silva's initial lies, given that he was on probation and being questioned about the murder

16   of a known drug dealer, are not highly probative evidence of Silva's guilty of Reynold's

17   murder, especially given that Silva eventually told the truth about contacting Reynolds.

18         Third, Petitioner claims that the trial court erred in excluding evidence of a

19   surveillance video approximately nine-tenths of a mile away from the victim's trailer, at a

20   major intersection, roughly around the time of the murder, showing a car similar to

21   Silva's white Honda.  But the "intersection was only a minute-and-a half drive from the

22   trailer, yet the video image was from 9:27 p.m., at least 17 minutes after the homicide."

23   Cassidy, 2012 WL 2126958, at *11.  As the state appellate court noted, even if the car

24   shown on the video was Silva's, his presence at a major intersection, roughly around the

25   time of the killing, is not highly probative of Silva's culpability, especially in the absence

26   of any other evidence connecting Silva to the scene of the crime.  See id.

27

28                                             22

Fourth, Petitioner claims that the trial court erred in excluding evidence that Silva underwent an "inconclusive" polygraph examination. But inconclusive polygraph results are not probative of anything, much less admissible to show guilt, as the state appellate court noted. See id. at *12.

Fifth, Petitioner claims that the trial court erred in excluding evidence that police found gun shot residue on one sleeve of Silva's sweatshirt, and on the steering wheel and gearshift knob of Silva's vehicle. But Petitioner offers no additional evidence as to the probative value of the gun shot residue. Petitioner's proffer at trial was only that police found "highly distinctive particles of gun shot residue," not how or when the particles came to be there, or if they were at all similar to the particles found at the victim's trailer. The state appellate court reasonably noted that the cast of characters involved in this case were gun users, and that the mere presence of gun shot residue on Silva's sweatshirt and in his vehicle, without more, is not probative of Silva's involvement in the murder of Reynolds. See id.

Finally, Petitioner claims that the trial court erred in excluding evidence that Silva possessed a ring and a knife that had previously belonged to the victim. Silva was a longtime friend of the victim, and neither Silva's possession of the ring nor the knife supported a motive to kill Reynolds. One witness shared her opinion that Reynolds would not have given away the ring, but that is all the statement was, an opinion. Silva claimed that Reynolds had given him the ring years before. Neither witness mentioned the knife. Under the circumstances, "possession of the ring and knife could reasonably be viewed by the court as lacking even slight probative value." Id.

Petitioner is not entitled to federal habeas relief on his claim of improper exclusion of certain evidence that Dennis Silva may have been responsible for the murder of Reynolds. Although the exclusion of trustworthy and necessary exculpatory evidence violates due process, the proffered evidence here was nothing more than speculative

1  because there was no direct or circumstantial evidence linking Silva to the actual robbery

2  and murder of Reynolds.  Under the circumstances, the California Court of Appeal

3  properly excluded the proffered evidence on the ground that its weak probative value was

4  outweighed by its potential for confusion and delay.  Accord Holmes, 547 U.S. at 327

5  (state may fashion rules that exclude evidence where probative value is outweighed by

6  factors such as confusion and potential to mislead).  The state court's determination

7  cannot be said to have been objectively unreasonable.  See 28 U.S.C. § 2254(d);

8  Williams, 529 U.S. at 409.

## CONCLUSION

10  After a careful review of the record and pertinent law, the Court is satisfied that

11  the petition for a writ of habeas corpus must be DENIED.

12  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of

13  appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because Petitioner has not

14  demonstrated that "reasonable jurists would find the district court's assessment of the

15  constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

16  The clerk shall enter judgment in favor of respondent and close the file.

17  SO ORDERED.

18  DATED:   April 7, 2014

CHARLES R. BREYER
19  United States District Judge

N:\Cassidy, E.13-1988.denial.final.wpd

24